UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| DAVID AGUILAR,<br>Plaintiff,<br>vs.<br>J. TAFELMEYER, *et al.*,<br>Defendants. | 3:23-cv-547-ART-CSD<br><br>ORDER (ECF Nos. 100/102, 120) |

Plaintiff David Aguilar sues Officers Joseph Johnson, Jeremy Tafelmeyer, Zachary Mahon, and Skyler Sheeks over a use-of-force incident. Before the Court is Defendants Motion for Summary Judgment (ECF No. 102.) Also before the Court is Magistrate Judge Craig Denney's report and recommendation ("R&R") that the Motion for Summary Judgment be denied in part. (ECF No. 120.) Defendants objected to the R&R (ECF No. 121), while Plaintiff did not. The Court now adopts the R&R in full.

## I. BACKGROUND

David Aguilar was incarcerated at Northern Nevada Correctional Center. He is legally blind due to glaucoma (ECF No. 102-2 at 21), and has been since as early as 2010. (ECF No. 113-7 at 19.) At the time of the events relevant to his complaint, he was recovering from cataract surgery on his left eye, impairing his vision still further. (ECF No. 113-2.)

This case arises out of a use-of-force incident on September 13, 2021. The parties dispute what happened during the event.

**A. Plaintiff's Version of Events**

Mr. Aguilar's best version of the facts in the record is as follows.

Even before the incident of September 13, 2021, Officer Johnson and Mr. Aguilar had a difficult relationship. Officer Johnson criticized Mr. Aguilar for "being too slow in getting to the chow hall or pill call" because of his blindness, and would search his area, leave it a mess, while saying things like "let's see if he can rearrange his house." (ECF No. 112-2 at 3.) Other inmates noticed that Officer Johnson treated Mr. Aguilar differently and more harshly than others, and that he had become particularly aggressive with Mr. Aguilar in the days prior to the incident. (ECF No. 102-1 at 16.)

On September 13, 2021, Officer Johnson told Mr. Aguilar that his TV was too loud and asked him to plug in his headphones. (ECF No. 112-2 at 3.) Mr. Aguilar said that the music was not from his TV, and showed Officer Johnson his headphones to demonstrate that they were, in fact, plugged in. (*Id.*)

Officer Johnson grabbed the headphones and threw them at Mr. Aguilar, hitting him in the teeth. (*Id.*) Roy Moraga, who was Mr. Aguilar's cellmate, saw Officer Johnson hit Mr. Aguilar first by throwing the headphones at him. (ECF No. 112-4.) Mr. Moraga also says that at some point during the incident, Officer Johnson apologized to Mr. Aguilar for hitting him first. (*Id.*)

Mr. Aguilar attempted to get up and accidentally brushed Officer Johnson's chest with his walking stick. (ECF No. 112-2 at 3.) Officer Johnson kicked the walking stick out from underneath Mr. Aguilar and pinned him to the wall. (*Id.* at 4.) Officer Johnson wrestled him to the floor, hitting his face on the bed, breaking Mr. Aguilar's partial dentures and injuring him. (ECF No. 102-6.) Officer Johnson punched Mr. Aguilar in the face several times. (ECF No. 112-2.) Officers Mahon, Sheeks, and Tafelmeyer came into the unit and beat Mr. Aguilar. (*Id.*) After Mr. Aguilar was cuffed and shackled, the four Defendants continued to beat him severely. (*Id.*) He was also tased "several times" before being placed in a

restraining chair. (*Id.*) Mr. Moraga and other inmates saw officers striking Mr. Aguilar while he was in mechanical restraints. (ECF No. 112-4.) In Mr. Aguilar's telling, he did not resist the officers' use of force. Nor would he have been able to after they had cuffed him, but they continued hitting him anyway. (*Id.*) Mr. Moraga stated in his declaration that he did not see Mr. Aguilar resisting.

Photographs taken immediately after the incident show that Mr. Aguilar had contusions and abrasions to the left shoulder, upper back, face, and left fifth finger; a left knee sprain; and a suspected nasal bone fracture. (ECF No. 113-7 at 19.)

Approximately a week after the September 13, 2021 incident, medical staff observed that Mr. Aguilar had an abnormal gait; and left side back, hip, leg, and knee pain. (ECF No. 113-7 at 20.) Progress notes indicate that he had "altercation" related lumbar radiculopathy, which is a spinal nerve root injury. (*Id.* at 24.) Mr. Aguilar's expert Dr. Ryan Herrington concluded that this altercation-related back injury, in conjunction with later-diagnosed arthritis in the spine, may have led to a lumbar intervertebral disc injury. (*Id.*)

Mr. Aguilar's back and knee injuries confined him to a wheelchair for months, and required a walker for several more. He was given a wheelchair at his appointment a week after the September 13 incident. (*Id.* at 20.) About three months after incident, Mr. Aguilar was ordered a left knee brace and walker. (*Id.* at 21.) Documentation from June of the following year referenced continued use of a walker. (*Id.* at 25.)

Dr. Herrington concluded that "[g]iven that this documentation appears nearly a year post injury, chronicity and a level of permanency is substantiated on a more likely than not basis." (*Id.*) Mr. Aguilar wrote in his declaration of December 12, 2025 that he still used a wheelchair periodically.

While Dr. Herrington opined that Mr. Aguilar's blindness would have indirectly increased his risk of exposure to use of force by preventing him from visually

perceiving Officer Johnson's approach, the tossing of headphones, or any potential show-of-force de-escalation efforts that NDOC Administrative Regulation 405 and American Correctional Association standards require whenever possible, particularly for inmates with special needs such as vision loss. (*Id.* at 24.)

**B. Defendants' Version of Events**

Defendants' version of events, as explained in their motion for summary judgment, is as follows. On September 13, 2021, during the 4:00 p.m. count, Officer Johnson instructed Aguilar to either lower the volume on his television or use his headphones. (ECF No. 102-1 at 18). When Officer Johnson returned less than one hour later (*Id.* at 28), Mr. Aguilar was still listening to the television at the same level as before and without headphones. (*Id.* at 18.) Officer Johnson again ordered Mr. Aguilar to use headphones or reduce the volume on the television. (*Id.*) Mr. Aguilar then presented the headphones to Officer Johnson in a sign of defiance and told Officer Johnson to "take" the headphones. (*Id.* at 28.) Officer Johnson took the headphones from Aguilar and tossed them toward Mr. Aguilar's bunk, unintentionally striking him in the head. (*Id.* at 18.)

Mr. Aguilar stood up and hit Officer Johnon in the torso with his walking cane. (*Id.*) Officer Johnson responded by attempting, unsuccessfully, to strike Mr. Aguilar with his fist. (*Id.*) Mr. Aguilar then charged and tackled Johnson to the floor, and punched him in the face multiple times. Each time Officer Johnson was struck, his head hit the concrete floor. (*Id.*; ECF No. 112-3 at 5-7.) Officer Johnson continued to fight with Mr. Aguilar, who was resisting, while simultaneously attempting to call for backup. (ECF No. 102-1 at 25.)

Officers Tafelmeyer, Sheeks, and Mahon entered the cell and began applying force to attempt to gain compliance as Mr. Aguilar actively resisted them. (*Id.* at 24.) Sergeant Flamm then entered the cell and deployed a single drive stun from a taser to Mr. Aguilar's shoulder. (*Id.*) Only then did Mr. Aguilar stop resisting

long enough for the officers to put both his hands in the mechanical restraints. (*Id.*)

After Mr. Aguilar was finally secured in the mechanical restraints, Sgt. Flamm called for the soft fabric wrap restraint system and transported him in a cart for medical evaluation. (ECF No. 102-1 at 22.) A medical staff member noted his injuries and contacted the on-call doctor, who ordered x-rays. (*Id.* at 23.)

Very soon after being ordered to the medical unit, Mr. Aguilar was cleared to be returned to a cell in unit 8. (*Id.*) Photos show that Mr. Aguilar had scratches, bruises, and a finger laceration. (ECF Nos. 102-5, 121) Officer Johnson was taken to Carson Tahoe Hospital immediately after the altercation. (ECF No. 112-3 at 14.) Photos show that he "was bleeding from the face after being tackled and repeatedly struck." (ECF Nos. 121, 102-5.)

Mr. Aguilar was prosecuted on battery-related charges. Defendants rely heavily on the investigative report of the Inspector General's Office, produced in connection with this prosecution, and the interviews with officers and prisoners therein for their version of the facts. However, the Carson City Municipal Court dismissed the charges against Mr. Aguilar on November 21, 2023.

**C. Administrative and Procedural History**

On September 16, 2021, Mr. Aguilar filed informal grievance number 20063128564, in which he stated: "I am partially blind and I am an ADA inmate. On 9-13-2021 I was assaulted by N.N.C.C. staff… Please investigate and file charges on all those involved in using excessive force on me. I was handcuffed and then beaten badly." (ECF No. 100-4.) On September 29, the Nevada Department of Corrections issued a response stating that his grievance was "partially granted as it has been referred to the IG's office for further investigation." (*Id.*) On October 27, Mr. Aguilar appealed his grievance to the first level, in which he stated that the officers "should be charged with excessive use of force and assault on [an ADA] blind person because I was hand cuffed and

shacked first." (ECF No. 100-3 at 2.) The response to the appeal also stated that his grievance was "referred to the Investigator General[‘s] office" and "partially granted" pending the outcome of the investigation. (*Id.* at 3.) There is no indication on the record that Mr. Aguilar received a formal denial, or that he filed a second level grievance. (*Id.*)

On June 22, 2022, a Criminal Investigator at the Office of the Inspector General in Washoe County swore out an affidavit that he believed that there was probable cause to prosecute Mr. Aguilar for battery-related crimes. (ECF No. 102-1.) The charges were later dismissed. (ECF No. 112-5.)

Mr. Aguilar initiated this case on November 3, 2023. In his First Amended Complaint, he claims that (1) Officer Tafelmeyer violated his Eighth Amendment rights by showing deliberate indifference to his serious medical needs in delaying his medical care after the incident, (2) NDOC violated his rights under Title II of the Americans with Disabilities Act through use of excessive force and other means, and (3) Officers Tafelmeyer, Johnson, Mahon, and Sheeks used excessive force against him in violation of the Eighth Amendment. (ECF No. 57.)

Defendants moved for summary judgment arguing that Mr. Aguilar had failed to exhaust his administrative remedies, and that his claims failed on the merits. (ECF No. 100.) Judge Denney entered an R&R recommending that Mr. Aguilar's Eighth Amendment excessive force claim and his ADA claim related to excessive force proceed, and that summary judgment be granted as to the rest. (ECF No. 120.) Defendants objected (ECF No. 121), while Mr. Aguilar did not.

## II. LEGAL STANDARD

### A. Review of Reports and Recommendations

This Court now reviews Judge Denney's R&R under the Federal Magistrates Act, which provides that a court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by [a] magistrate judge." 28 U.S.C. § 636(b)(1). Where a party timely objects to a magistrate judge's report and

recommendation, then the court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made." *Id.* A court is not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985). Under this binding authority, only the objected-to portions of the R&R must be reviewed. *See, e.g.*, *Fuller v. Lopez*, No. CV1905818PHXDWLCDB, 2021 WL 321234, at *3 (D. Ariz. Feb. 1, 2021) (citing S. Gensler, 2 Federal Rules of Civil Procedure, Rules and Commentary, Rule 72, at 422 (2018)). The district court may still review the portions of the R&R not subject to an objection if it chooses, as nothing "preclude[s] further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard." *Id.* at 154.

**B. Summary Judgment**

A "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

To determine whether there is a genuine issue for trial, all evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are drawn in the nonmovant's favor. *See id.* at 255. Nonetheless, only justifiable inferences should be drawn. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). A party's story may be "blatantly contradicted" by the record when it is up against "evidence capable of objectively disproving witness testimony." *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022).

After the judge determines the non-movant's most favorable version of the facts, summary judgment is granted if there is still insufficient evidence for a reasonable jury to find for the non-movant. *See Anderson*, 477 U.S. at 248-49. When a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**III. DISCUSSION**

**A. Mr. Aguilar has exhausted his administrative remedies under the PLRA.**

Defendants argue that all of Plaintiff's claims fail because he failed to exhaust his administrative remedies. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Generally, the statute requires that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court[.]" *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). But, because the PLRA requires exhaustion of those administrative remedies "as are available," it does not require exhaustion when circumstances render administrative remedies "effectively unavailable." *See Sapp v. Kimbrell*, 623 F.3d 813, 822-23 (9th Cir. 2010). In other words, an inmate must exhaust only those grievance procedures "that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross v. Blake*, 578 U.S. 632, 642 (2016) (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). The purposes of administrative exhaustion would not be served by requiring prisoners to continue pursuing relief past the point where there is no

more possibility that corrective action would be taken. *Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005).

Failure to exhaust administrative remedies is a non-jurisdictional affirmative defense that defendants must raise and prove. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014); *Jones v. Bock*, 549 U.S. 199, 212-17 (2007).

First, a "defendant must… prove that there was an available administrative remedy and that the prisoner did not exhaust that available remedy." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015). To show that the inmate had administrative relief available to them, a defendant may bring the information that was provided to the prisoner, and statutes, regulations, official directives, and other evidence on the scope of the administrative review process. *Brown*, 422 F.3d at 937. If the defendant meets this burden, "the burden shifts to the plaintiff, who must show that there is something particular in his case that made the existing and generally available administrative remedies effectively unavailable to him by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Williams*, 775 F.3d at 1191.

**i. Mr. Aguilar appealed his grievance as far as necessary to exhaust his claims.**

Judge Denney correctly concluded that Mr. Aguilar had exhausted his administrative remedies, relying on *Brown v. Valoff*, 422 F.3d 926, 937–38 (9th Cir. 2005). *Brown* involved two inmates with comparable grievance histories, one of whom the Ninth Circuit held had exhausted his available remedies, and the other one of whom had not. The successful inmate stopped appealing his grievance after he received a response stating that it was "partially granted" and that an investigation would be conducted. The response contained no language suggesting that the plaintiff could appeal again. *Id.* at 931-32. Furthermore, the corrections department Operating Manual stated that complaints about staff misconduct would result in investigations, which would be kept confidential. *Id.*

at 938. The Ninth Circuit therefore held that both the response and the applicable prison regulations showed that the inmate exhausted all available administrative remedies when he received his partial grant. *Id.* ("[N]o further relief was in fact 'available' through the appeals process, although the staff complaint process to which the grievance was directed instead had not yet run its course"). The second inmate stopped appealing after he was told that his compound grievance was both denied and referred for investigation into staff misconduct. The response contained instructions on how to appeal the issues other than those being investigated. *Id.* at 933. Unlike the first inmate, the Ninth Circuit held that he did not exhaust his effective remedies. *Id.*

Mr. Aguilar's case is similar that of the successful inmate in *Brown.* Both the governing regulations about grievance appeals and the prison's responses to his grievance would have suggested to him that administrative remedies "effectively unavailable" to him. Here, as in *Brown*, his partial grant and referral for further investigation "contain[ed] no language suggesting that plaintiff could appeal the decision to the third level of review[, and] it is unclear what would be left to appeal, as plaintiff's appeal was partially granted and an investigation was to be conducted." *Id.* at 932. Then he stopped appealing his grievance. Having received the same response to his informal and first level grievances, Mr. Aguilar reasonably could have concluded that further appeal to the second and final level would be futile and yield exactly the same result. (ECF No. 100-3 at 9-10.) The relevant administrative rule would also have suggested to him that he had no further appeal. The rules provided no guidance on whether appeal is available in the case of a partial grant. While a grievance "denied in its entirety" could be appealed to the next level, his grievance was not entirely denied. (ECF No. 112-6.)

Exhaustion does not depend on the outcome of the investigation. Defendants argue that Mr. Aguilar's grievance was denied when the investigation

failed to result in his requested relief. (ECF No. 121.) Defendants' theory is that when the investigation concluded without charges being brought against the officers, Mr. Aguilar had a denial that he could appeal. But there is nothing in the record to show that Mr. Aguilar received a notice of denial, was told that the investigation was officially over, or got an explanation that the charges brought against him would be the only result. (ECF No. 120 at 10.) Furthermore, in *Brown*, the Ninth Circuit held that exhaustion was effectively complete after the inmate received notice that his grievance was partially granted and an investigation was opened, without requiring him to wait to see if he received requested compensation for staff misconduct. *Id.* at 930 n.3, 931-32.

**ii. Mr. Aguilar's grievance adequately raised his ADA claims.**

Defendants argue in the alternative that the content of Mr. Aguilar's grievance didn't adequately raise his ADA claim. A grievance suffices to exhaust a claim if it puts the prison on adequate notice of the problem for which the prisoner seeks redress. *Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010). To provide adequate notice, the prisoner need only provide the level of detail required by the prison's regulations. *Jones v. Bock*, 549 U.S. 199, 218 (2007). Where a prison's regulations are "incomplete as to the factual specificity [required in an inmate's grievance], a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir.2009) (internal quotation marks omitted).

Mr. Aguilar's grievance stated that he was an "ADA inmate" who was the victim of use of "excessive force" when he was "handcuffed and then beaten badly" on September 13, 2021. (ECF No. 100-4.) Defendants allege that Mr. Aguilar's grievance does not meet the standards of Administrative Regulation 740, which states that "the inclusion of more than one grievance issue[] per form will be cause for the grievance to not be accepted." (ECF No. 112-6 at 5.) They also object that "nothing in the grievance addresses accommodations."

Defendants have not carried their burden to show that Mr. Aguilar's grievance failed to exhaust his ADA claim. Although the grievance mentions both the ADA and excessive force, arguably presenting at least two separate legal theories, the grievance appears proper under the administrative rule in that it addresses only one factual issue. Both the ADA and the Fourth Amendment claim are predicated on the same facts, namely officers' allegedly disproportionate and unnecessary use of force. Furthermore, Mr. Aguilar's grievance was sufficiently detailed to put the prison on adequate notice of the problem that he now seeks to address under the ADA. It stated that he had a qualifying disability under the ADA and that the prison officials used excessive force against him. That is the essence of Mr. Aguilar's cognizable ADA theory. *See infra*, Section III.D.

**B. Mr. Aguilar's excessive force claim survives summary judgment.**

Defendants argue that they did not use excessive force against Mr. Aguilar because under every believable version of the facts, force was deployed in a good faith effort to impose discipline in a corrections setting. The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" *See Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)). There is a "settled rule" that "the unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (cleaned up). 'In the context of quelling a prison disturbance, the question of whether officials "inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 6 (cleaned up).

The Supreme Court in *Hudson* held that in the corrections context, courts consider factors such as (1) the extent of injury suffered by an inmate, (2) the

need for application of force, (3) the relationship between that need and the amount of force used, (4) the threat reasonably perceived by the responsible officials, and (5) any efforts made to temper the severity of a forceful response. *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003) (citing *Hudson*, 503 U.S. at 7). With regard to the first factor, although an inmate need not have suffered serious injury to bring an excessive force claim against a prison official, the Eighth Amendment's prohibition on cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force. *Hudson*, 503 U.S. at 9-10.

The R&R correctly concluded that if a jury were to believe Mr. Aguilar's version of the facts, he could prevail on an excessive force claim, and that therefore there was a genuine issue of material fact precluding summary judgment on the Eighth Amendment claim. In Mr. Aguilar's telling of events, partially corroborated by Mr. Moraga and the expert declaration of Dr. Herrington, the injuries caused by the officers left him in a wheelchair for months and reliant on a walker for almost a year after the incident. (ECF No. 113-7 at 20.). The need for application of force would have been low because in Mr. Aguilar's best version of the facts, Officer Johnson hit him first, and other officers beat and tased him while he was restrained and unresisting. (ECF No. 112-2 at 3, 112-4.) If Mr. Aguilar is correct, then the force used, which included at least one taser, would have been disproportionate to the need to subdue an almost entirely blind man who was not physically resisting officers. Thus, for summary judgment purposes, officers could have applied force maliciously and sadistically for the purpose of causing harm. *Hudson*, 503 U.S. at 6-7.

Defendants' objection essentially boils down to an argument that Mr. Aguilar's evidence is weak, incredible, and "blatantly contradicted" by the rest of the record such that no reasonable jury could find in his favor. (ECF No. 121 at 7.) A court's role is not to weigh the evidence, but merely to determine whether

all justifiable inferences drawn in the nonmovants favor establish a genuine issue for trial. *Anderson*, 477 U.S. at 249–50, 251. If Defendants had a videotape, photographs, or audio recording of the incident at issue that was "capable of objectively disproving" Mr. Aguilar's account, perhaps summary judgment could be granted in their favor. *Hughes*, 31 F.4th at 1218. But Defendants present no such evidence. While they reference photographs of Mr. Aguilar's injuries, the surface-level appearance of his injuries (and Officer Johnson's) are not conclusive of whether or not the use of force was justified. *See Hudson*, 503 U.S. at 6-7. The rest of Defendants' evidence, including the investigator's report, is ultimately drawn from witness accounts and depends on perception and credibility, which are questions for the factfinder.

**C. Officers are not entitled to qualified immunity to Mr. Aguilar's excessive force claim on summary judgment.**

The officers claim entitlement to summary judgment on the basis of qualified immunity. Qualified immunity is not merely an immunity from liability, but also an immunity from suit. *Hunter v. Bryant*, 502 U.S. 224, 227-28 (1991); *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1098–99 (9th Cir. 1995). The doctrine of qualified immunity balances two important interests: "the need to hold public officials accountable when they exercise power irresponsibly" against "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The qualified immunity defense allows for mistaken judgments and protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* In so doing, it protects public officials "'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)).

The Supreme Court has set forth a two-part analysis for resolving government officials' qualified immunity claims. *Saucier v. Katz*, 533 U.S. 194,

201 (2001). Under the *Saucier* analysis, "[q]ualified immunity protects government officials from liability under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024) (internal quotation marks and citations omitted). In the first step of the process, the court considers whether the facts "[t]aken in the light most favorable to the party asserting the injury . . . show [that] the [defendant's] conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. In the second, the court determines whether the right was clearly established at the time of the alleged violation. *Id.* A right is clearly established if, at the time of the challenged conduct, "every reasonable official would have understood that what he [was] doing violate[d] that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citations and quotations omitted). "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Hunter*, 502 U.S. at 229.

Since the first *Saucier* prong was already addressed, and it has already been decided that there is an issue of material fact as to a constitutional violation, this analysis will focus on the second prong. Notwithstanding the constitutional violation, if no factfinder could find that the Defendants violated a clearly established right, then summary judgment must be granted on the basis of qualified immunity.

The R&R correctly concluded that qualified immunity should be denied, since it was clearly established in September 2021 "that the malicious and sadistic use of force violates the Eighth Amendment;" "that the use of force on an inmate who is not resisting constitutes excessive force;" and "that the use of a taser can amount to an Eighth Amendment violation if done maliciously and sadistically." Controlling precedents in *Hudson*, *Martinez*, and *Rodriguez* clearly establish these rules. Since the Supreme Court decided *Hudson*, it has been

clearly settled that an inmate may prevail on an excessive force claim if they suffered an injury that was disproportionate to officers' need to subdue him. *Hudson*, 503 U.S. at 7. *Martinez* and *Rodriguez* applied *Hudson* to hold that the use of violent force on an unresisting prisoner was an obvious and clearly established violation of the Eighth Amendment. *Rodriguez*, 891 F.3d at 795 (quoting *Kislea v. Hughes*, 584 U.S. 100, 103 (2018)) ("[N]o reasonable officer in appellants' positions would have believed that beating a prisoner to the point of serious injury, unconsciousness, or hospitalization solely to cause him pain was constitutionally permissible"). In *Rodriguez,* the Ninth Circuit inferred that even though *Hudson* and *Martinez* did not involve use of a taser, their reasoning was sufficient to clearly establish that using a taser maliciously and sadistically was a violation of the Eighth Amendment. *Rodriguez*, 891 F.3d at 796.

As explained previously, Mr. Aguilar has brought evidence that officers used significant force on him when he did not provoke a confrontation and he was not resisting. If Mr. Aguilar's version of events is accepted at summary judgment, as they must be, then there is a material question as to whether Defendants have violated those rights. Defendants attempt to distinguish this case on its facts, arguing that *Hudson*, *Martinez*, and *Rodriguez* "did not place 'beyond debate' that Defendants' response to Aguilar's ongoing assault on Officer Johnson, hands-on restraint and a single drive-stun that ceased once Aguilar was secured, violated the Eighth Amendment." (ECF No. 121 at 12.) This objection fails because it depends on finding that Mr. Aguilar was in fact assaulting Officer Johnson in a manner that would justify the use of force against him. At this stage in the proceedings the facts are construed in the most favorable justifiable light to Mr. Aguilar.

**D. Mr. Aguilar's ADA claim predicated on excessive force survives summary judgment.**

Defendants say they are entitled to summary judgment on Mr. Aguilar's ADA claim because the ADA does not cover the use of excessive force against individuals with qualifying disabilities, and because the use of force was not caused by Mr. Aguilar's disability.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The implementing regulations provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

To state a claim under title II of the ADA, a plaintiff must generally show:

> (1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.

*Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), as amended on denial of reh'g (Oct. 11, 2001).

There is no dispute here that Mr. Aguilar is a qualified individual with a disability. Defendants dispute whether an ADA claim can be extended to the prison use-of-force context, and whether or not evidence shows that the alleged harms may have been "by reason of" Mr. Aguilar's disability.

The ADA can be extended to use of force claims against officers. The Ninth Circuit has held that the terms "services, programs, or activities" encompass

"anything a public entity does." *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232– (9th Cir. 2014) (rev'd on other grounds) (quoting *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir.2002)). In *Sheehan*, a social worker called the police to conduct a welfare check on the "gravely disabled" plaintiff. *Id.* at 1216. The plaintiff reacted violently to the officers' presence, and they left the room. *Id.* Officers then drew their weapons, forced their way back into the room, and then shot her five or six times. *Id.* at 1216-17. The Ninth Circuit held that the city of San Francisco was not entitled to judgment on the plaintiff's ADA claim as a matter of law because police may violate the ADA where they fail to reasonably accommodate a person's disability during the course of an arrest, causing them to suffer greater injury or indignity in the process than others similarly situated. *Id.* at 1233. As a consequence, a plaintiff with a qualifying disability may state an ADA claim against police officers based on their excessive use of force. *Id.* Although there may be special exigencies in police work, these go to the ADA's reasonableness analysis, not to whether police use of force is covered by the ADA at all. *Id.* at 1232.

While *Sheehan* was decided in the context of an arrest, its reasoning extends to the prison use-of-force context. If "anything a public entity does" is potentially subject to ADA analysis, and corrections work is something a public entity does, then prison use-of-force issues can be articulated as ADA claims. *See id.* It follows that "the second element of a § 12132 claim can be satisfied where a correctional officer could have used less force or no force during the performance of his penological duties with respect to a disabled person." *Armstrong v. Newsom*, 484 F. Supp. 3d 808, 843 (N.D. Cal. 2020), aff'd, 58 F.4th 1283 (9th Cir. 2023).

Turning now to the causation inquiry, there is a material dispute of fact as to whether Mr. Aguilar was discriminated against by a public officer by reason of his impaired vision. It is clear that Mr. Aguilar is significantly vision-impaired.

Mr. Aguilar has brought evidence showing that Officer Johnson had a history of harassing him for disability-related reasons. Mr. Aguilar has said that Officer Johnson particularly gave him a difficult time for "being too slow in getting to the show hall or pill call" because of his blindness, and that Officer Johnson would search his area, leave it a mess, and say things like "let's see if he can rearrange his house." (ECF No. 12-2 at 3.) The investigator's report upon which Defendants largely rely for their version of the facts contains inmate statements that Officer Johnson treated Mr. Aguilar differently and more harshly than others, and that he had become particularly aggressive with Mr. Aguilar in the days prior to the incident. (ECF No. 102-1 at 16.) In the context of the history between them, if Officer Johnson instigated or unreasonably escalated the confrontation, it could be because of Mr. Aguilar's disability.

## IV. CONCLUSION

IT IS HEREBY ORDERED that the Report and Recommendation of the Magistrate Judge is ADOPTED in full. (ECF No. 120.)

IT IS FURTHERMORE ORDERED that Defendants' motion for summary judgement is GRANTED IN PART and DENIED IN PART. (ECF No. 100/102.) The motion is denied as to Plaintiff's excessive force claim, and denied as to his ADA claim insofar as that claim is based on excessive force. In all other respects, the motion is granted.

Dated this 17th day of July, 2026.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE